1   DISABILITY RIGHTS ADVOCATES
    SIDNEY WOLINSKY (Bar No. 33716)
2   STUART SEABORN (Bar No. 198590)
    MELISSA RIESS (Bar No. 295959)
3   2001 Center Street, Fourth Floor
    Berkeley, California 94704-1204
4   Telephone: (510) 665-8644
    Facsimile:  (510) 665-8511
5   swolinsky@dralegal.org
    sseaborn@dralegal.org
6   mriess@dralegal.org

7   CHAVEZ & GERTLER LLP
    MARK A. CHAVEZ (Bar No. 90858)
8   NANCE F. BECKER (Bar No. 99292)
    42 Miller Avenue
9   Mill Valley, California 94941
    Telephone: (415) 381-5599
10  Facsimile:  (415) 381-5572
    mark@chavezgertler.com
11  nance@chavezgertler.com

12  Attorneys for Plaintiffs

13

14              **UNITED STATES DISTRICT COURT**

15             **NORTHERN DISTRICT OF CALIFORNIA**

16

17

18  INDEPENDENT LIVING RESOURCE        Case No.
    CENTER SAN FRANCISCO, a California
19  non-profit corporation, JUDITH SMITH, an   **COMPLAINT FOR INJUNCTIVE AND**
    individual, JULIE FULLER, an individual,   **DECLARATORY RELIEF FOR**
20  and SASCHA BITTNER, an individual,   **VIOLATIONS OF THE AMERICANS**
                                         **WITH DISABILITIES ACT, 42 U.S.C. §§**
21              Plaintiffs,             **12181, *et seq*.**

22  v.                                 **CLASS ACTION**

23  UBER TECHNOLOGIES, INC., a Delaware
    Corporation, RASIER, LLC, a Delaware
24  Corporation, and RASIER-CA, LLC, a
    Delaware Corporation,
25
                Defendants.
26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

# I.    INTRODUCTION

1.      Plaintiffs bring this action to remedy ongoing discrimination against people with mobility disabilities who want to, but cannot, use the transportation service operated by Uber Technologies, Inc. ("Uber"). Since launching its transportation service in San Francisco in July 2010, Uber has experienced explosive growth, has seized an ever-expanding market share from taxi companies and is now a major provider of individual transportation services in the United States. Uber's success is based on the quality of its service, which provides users with reliable on-demand transportation within minutes in over 600 cities worldwide. Unfortunately, in its rapid growth into a multi-billion-dollar behemoth, Uber has not taken adequate steps to satisfy its legal responsibility to provide the same reliable on-demand transportation service to individuals who use wheelchair accessible vehicles ("WAVs").

2.      Uber purports to offer WAVs to users in the Bay Area through its UberWAV button, but the reality is this button only provides riders second-class service – when it provides service at all. Even when the service is available, the average wait time in San Francisco for UberWAV is almost four times longer than for non-wheelchair accessible UberX. In Alameda County, the wait time for a WAV is on average 12 times longer. Unlike all of Uber's other services, UberWAV does not offer the option of reserving a ride in advance.

3.      Uber is one of the leading companies in the new "sharing economy." It provides on-demand rides to individuals through its network of over 2,000,000 drivers globally. The riders pay Uber through Uber's smart phone application with their credit cards, and Uber splits the payments with its drivers. Uber's phenomenal success and unparalleled growth pose an existential threat to traditional taxi service, and Uber has invested heavily in what it considers to be transportation technologies of the future, including autonomous vehicles. As a result Uber's market value has grown to over $70 billion.[1]

4.      It appears that the future of on-demand transportation belongs to Uber and that, unless forced to do so by this Court, Uber will exclude disabled individuals from that future. As

---

[1] NY Times, "Uber and Lyft Charge Toward Potential I.P.O.s Next Year", https://www.nytimes.com/2018/10/16/technology/uber-lyft-ipo.html (Oct. 16, 2018).

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    detailed below, Uber's acts and practices deny individuals who need wheelchair accessible

2    vehicles equal access to the service it provides, and prevent them from obtaining the benefits of

3    its service. Such conduct directly violates the Americans with Disabilities Act ("ADA"), 42

4    U.S.C. § 12101, *et seq.*

5          5.      It is fully within Uber's power to provide reliable and timely accessible service.

6    Uber tightly controls all aspects of how both its drivers and riders use the service, mediating all

7    payments, regulating the types of vehicles the drivers use, and offering financial incentives to

8    ensure that there are enough drivers on the road to meet the demand for rides. Moreover, Uber is

9    already providing widespread wheelchair accessible transportation in London and six other cities

10   around the United Kingdom.  Uber could similarly end its discrimination against people in the

11   Bay Area who need wheelchair accessible vehicles if it chose to do so.

12         6.      This litigation is intended to halt Uber's ongoing discrimination against

13   individuals with mobility disabilities. Plaintiffs seek injunctive and declaratory relief to redress

14   Uber's violations of the ADA and California law. Because Defendants' practices adversely

15   impact hundreds, if not thousands, of disabled individuals, Plaintiffs ask the Court to certify their

16   claims for class treatment and to order relief that will benefit all members of the Class.

17         **II.**      **PARTIES**

18         7.      Plaintiff Independent Living Resource Center San Francisco ("ILRC") is a

19   disability rights organization in San Francisco, California, that advocates for people with

20   disabilities and supports them in living independent and active lives. ILRC's board, staff, and the

21   consumers of its services include people with mobility disabilities who have been deterred from

22   downloading and using Uber because of Uber's failure to provide them with full and equal

23   access to its service. Uber's discriminatory policies and practices regularly impose economic

24   harms on ILRC, frustrate the organization's efforts to engage in its core advocacy work, and

25   force it to divert resources that it needs to spend on other work. Plaintiff ILRC sues on behalf of

26   itself, its consumers, board members, and staff, and in furtherance of its mission of ensuring that

27   people with disabilities are fully integrated into the social and economic fabric of their

28   communities.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    8.    Plaintiff Judith Smith is an individual residing in Alameda County. She uses a

2  motorized wheelchair and would use Uber but for the lack of reliable and timely wheelchair

3  accessible Ubers. Because Ms. Smith has heard about and witnessed the unavailability of the

4  service she has not downloaded Uber's application because she knows that Uber's WAV service

5  is frequently unavailable.

6    9.    Plaintiff Julie Fuller is an individual residing in Alameda County. She uses a

7  motorized wheelchair and would use Uber but for the lack of reliable and timely wheelchair

8  accessible Ubers. She has learned that WAVs are not available through Uber from other

9  wheelchair users, and people she knows at ILRC. She has not downloaded Uber's application

10  because she knows that Uber's WAV service is frequently unavailable.

11    10.    Plaintiff Sascha Bittner is an individual residing in San Francisco. She uses a

12  motorized wheelchair and would use Uber but for the lack of reliable and timely wheelchair

13  accessible Ubers. She has witnessed family members attempt to call wheelchair accessible Ubers

14  and knows that they are not reliably available. She would use Uber's WAV service if she could

15  count on it for reliable door-to-door transportation.

16    11.    Defendant Uber Technologies, Inc. ("Uber"[2]) is a for-profit corporation that

17  provides on-demand transportation services throughout California, including in Alameda and

18  San Francisco Counties. Uber is registered in Delaware and its principal place of business is San

19  Francisco, California.

20    12.    Defendant Rasier, LLC ("Rasier") is a for-profit corporation registered in

21  Delaware with its principal place of business in San Francisco, California. Rasier is a subsidiary

22  of Uber Technologies, Inc.

23    13.    Defendant Rasier-CA, LLC ("Rasier") is a for-profit corporation registered in

24  Delaware with its principal place of business in San Francisco, California. Rasier-CA, LLC is a

25  subsidiary of Uber Technologies, Inc.

26

27

28

---

[2] The name "Uber" will be used to refer to all Defendants named in this Complaint.

### III.    JURISDICTION

14.    Plaintiffs bring this action for declaratory and injunctive relief under the Americans with Disabilities Act, 42 U.S.C. §§ 12181, *et seq.* The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 42 U.S.C. § 12188. The Court has jurisdiction to issue declaratory relief under 28 U.S.C. § 2201 and to order further relief under 28 U.S.C. § 2202.

### IV.    VENUE

15.    Venue is proper in the Northern District of California under 28 U.S.C. §§ 1391(b)-(c) because Defendants' principal place of business is in San Francisco, California, the business practices at issue were conducted throughout California, including in San Francisco County and Alameda County, liability arose in those counties, and events and conduct giving rise to the violations of law asserted herein occurred in those counties. Plaintiffs Judith Smith and Julie Fuller reside in Oakland, California, and Sascha Bittner resides in San Francisco. They have suffered discrimination on the basis of their disabilities and been deterred from taking advantage of the transportation service offered by Uber in Alameda County and San Francisco. Plaintiff ILRC has its principal place of business in San Francisco, and has likewise suffered injury there.

### V.    INTRADISTRICT ASSIGNMENT

16.    The appropriate division for this case is the San Francisco Division. Defendants' principal place of business is in San Francisco and a substantial part of the acts or omissions, including the business practices at issue in this case, were developed and implemented in San Francisco.

### VI.    CLASS ACTION ALLEGATIONS

17.    Pursuant to Federal Rule of Civil Procedure 23(b)(2), Plaintiffs bring this action on behalf of themselves and all other persons similarly situated. The Class consists of all individuals in San Francisco County and Alameda County who are disabled because of a mobility impairment, utilize wheelchairs and therefore use accessible transportation, and who have been and continue to be deterred from using Uber's transportation service due to Uber's

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1 discriminatory acts and practices. Excluded from the Class is any individual who has previously

2 utilized Uber and/or has downloaded the Uber application, and Uber's officers and employees.

3       18.    Plaintiffs are unable to state the precise number of potential members of the

4 proposed Class. The Class numbers in the hundreds, if not thousands, and members of the Class

5 are sufficiently numerous and geographically diverse that joinder of all members is

6 impracticable.

7       19.    There is a well-defined community of interest among the members of the

8 proposed Class in that there are questions of law and fact common to all of their claims. Those

9 common issues include, but are not limited to: whether Uber provides the transportation services

10 that Plaintiffs can use; and whether Uber has violated Title III of the ADA by failing to provide

11 equal access to its service to people who use wheelchairs and need WAVs.

12       20.    Plaintiffs' claims are typical of, and not antagonistic to, the claims of all other

13 members of the Class because Uber conducted and continues to conduct its business in a manner

14 which caused, continues to cause, and will in the future cause all Class members to suffer the

15 same or similar injury. Plaintiffs, by advancing their claims, will also advance the claims of all

16 other similarly-situated individuals.

17       21.    Plaintiffs and their counsel will fairly and adequately protect the interests of

18 absent Class members. There are no material conflicts between Plaintiffs' claims and those of

19 absent Class members that would make class certification inappropriate. Plaintiffs' counsel are

20 experienced in disability rights and class action litigation, and will vigorously assert Plaintiffs'

21 claims and the claims of all Class members.

22       22.    A class action is superior to other potential methods for achieving a fair and

23 efficient adjudication of this controversy. Whatever difficulties may exist in the management of

24 this case as a class action will be greatly outweighed by the benefits of the class action

25 procedure, including but not limited to providing Class members with a method for the redress

26 and prevention of their injuries and claims that could not, given the complexity of the issues and

27 the nature of the requested relief, be pursued in individual litigation. Further, the prosecution of

28

1 │ separate actions by the individual Class members, even if possible, would create a risk of

2 │ inconsistent or varying adjudications and incompatible standards of conduct for the Defendant.

3 │ **VII.    GENERAL ALLEGATIONS**

4 │     23.    Uber provides transportation services to members of the general public, including

5 │ in San Francisco County and Alameda County.

6 │     24.    Uber is not a broker or a middleman merely facilitating a transaction through a

7 │ smart phone application. Instead, it provides transportation to its customers by recruiting and

8 │ retaining a network of drivers who contractually agree to provide rides to Uber's customers in

9 │ accordance with terms and conditions specified by Uber. Similarly, Uber's customers must enter

10 │ into contracts with Uber to utilize its service on terms and conditions specified by Uber. In all

11 │ material respects, including the financial terms, the transactions between the drivers and the

12 │ customers are dictated, mediated, and controlled by Uber. There are no negotiations between

13 │ Uber's drivers and its customers. And Uber takes the lion's share of the revenues generated in

14 │ the transactions.

15 │     25.    Uber provides different levels of transportation service around the country. In San

16 │ Francisco and Alameda Counties, the company offers UberX, its basic rideshare option, Uber

17 │ POOL, a carpooling service, Uber Select and Uber Black, premium transportation services, and

18 │ UberXL and UberSUV, services limited to larger vehicles. In addition, it purports to offer Uber

19 │ Assist, a service in which the drivers have self-certified as being willing to assist riders with

20 │ mobility disabilities, and UberWAV, a car service option offering wheelchair accessible

21 │ vehicles.

22 │     26.    Uber has created a genuinely new mode of transportation, generating both the

23 │ demand for rides and the supply of drivers by incentivizing both the riders and the drivers to

24 │ participate in the service. Without Uber, this new mode of transportation would not exist.

25 │     27.    Moreover, Uber perceives itself as creating a new transportation service which

26 │ transcends the technology. Uber urges commuters to consider it a "daily transportation option" or

27 │ one that complements their use of other modes of transportation ("While public transportation is

28 │ still very much a necessity, research has found that Uber acts as an important complement for

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

commuters."[3]) Uber has even compared itself to a utility ("Today we aspire to make transportation as reliable as running water, everywhere and for everyone"[4]) and touted the ability of its transportation service to tackle difficult public policy issues such as "congestion, pollution and parking by getting more people into fewer cars."[5] In Uber's own words: "Our work doesn't end with transporting people."[6] In the words of the Northern District of California: "Uber does not simply sell software; it sells rides." *O'Connor v. Uber Techs. Inc.*, 82 F. Supp. 3d 1133, 1141 (N.D Cal. 2015).

**A.**     **Uber Discriminates Against Individuals With Mobility Disabilities By Failing To Provide Wheelchair Accessible Vehicles**

28.      Uber purports to offer access to wheelchair accessible vehicles to users in the Bay Area. However, although the app includes an UberWAV button, the reality is that this button only provides riders second-class service – when it provides service at all.

29.      When a wheelchair accessible Uber is available in San Francisco, the wait times for these vehicles are on average almost four times longer than for non-wheelchair accessible UberX. In Alameda County, the wait time for a WAV is on average 12 times longer. This is not an effective or viable component of Uber's transportation system.

30.      Plaintiffs tested a number of central locations around the Bay Area daily in September 2018 and October 2018. In Alameda County, a total of 60 tests during business hours reflected an average estimated wait time for an UberWAV of 29.7 minutes. In comparison, the average estimated wait times for an UberX in the same locations was 2.4 minutes. In other words, on average an UberWAV rider is told they will have to wait 12.4 times longer than an UberX rider. Some estimated wait times listed for UberWAVs were as long as 51 minutes. In

---

[3] Uber.com, How Uber Can Be a Daily Transit Option, https://www.uber.com/newsroom/how-uber-can-be-a-daily-transportation-option/, October 5, 2016.

[4] Uber.com, Celebrating Cities: A New Look and Feel for Uber, https://www.uber.com/newsroom/celebrating-cities-a-new-look-and-feel-for-uber-7/, February 3, 2016.

[5] Travis Kalanick, Uber's Plan to Get More People Into Fewer Cars, https://www.ted.com/talks/travis_kalanick_uber_s_plan_to_get_more_people_into_fewer_cars, February 2016.

[6] Uber.com, Advanced Technology Group, https://www.uber.com/info/atg/

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    only one test out of 60 did the estimated wait time for an UberWAV dip into the single digits (8

2    minutes). In one instance, the app reflected that no WAVs were available. In San Francisco, the

3    average estimated wait time for an UberWAV was 11.5 minutes, almost four times longer than

4    the average for an UberX. UberWAV estimated wait times could reach as high as 21 minutes,

5    whereas for an UberX at the same location, the estimated wait was 2 minutes.

6         31.    The information above was based on testing of estimated wait times at central

7    locations during business hours in the morning and the evening. Anecdotal reports of UberWAV

8    use reflect that the service may be even more inadequate than the above information suggests.

9    For example, an UberWAV user reported an occasion when she used UberWAV for the journey

10   to an appointment. When she tried to request an UberWAV for the return journey, she received a

11   message that no cars were available for two hours before she obtained confirmation that an

12   UberWAV could take her. Once the ride was finally confirmed, she had to wait an additional 25

13   minutes for the vehicle to arrive. This rider reported that about 50 percent of her requests for a

14   ride using Uber's app yield a message that no cars are available. She has been reluctant to use

15   UberWAV because of the risk of being stranded and unable to get transportation home. To make

16   this risk worse, UberWAV does not offer the possibility of booking a vehicle in advance –

17   although the option of advanced reservations is available for all of Uber's other services.

18        32.    Uber riders who use wheelchair accessible vehicles are also denied access to all

19   but one of Uber's transportation classes.  Riders who use wheelchairs requiring lifts or ramps can

20   only travel in an UberWAV. They cannot use Uber's carpool service UberPOOL, its large

21   vehicle services UberXL and UberSUV, and its deluxe vehicle services such as UberBLACK or

22   UberSelect.

23        33.    Uber has been sued in cities around the United States for its violation of disability

24   laws by failing to provide wheelchair-accessible service, yet has continued its policy of denying

25   that service. *See*, *e.g., Equal Rights Center v. Uber Technologies, Inc.*, No. 17-cv-01272 (D.D.C.

26   filed 6/28/2017), *Access Living of Metropolitan Chicago v. Uber Technologies, Inc.*, No. 16-cv-

27   09690 (N.D. Ill. Filed 10/13/2016), *Crawford v. Uber Technologies, Inc.*, No. 3:17-cv-02664-RS

28   (N.D. Cal. Filed 5/9/2017), *Namisnak v. Uber Technologies, Inc.*, No. 3:17-cv-06124-RS (N.D.

1   Cal. Filed 10/26/2017), *Ramos v. Uber Techs., Inc.,* No. SA-14-CA-502-XR, 2015 WL 758087

2   (W.D. Tex. Feb. 20, 2015).

3       34.     Although Uber exercises substantial control over drivers to incentivize them to

4   drive for Uber and to drive at particular times, there is no indication that Uber is doing anything

5   to incentivize drivers to drive wheelchair accessible Ubers. It has previously admitted that it is

6   doing nothing: "[Uber] doesn't treat Drivers who have or want WAVs any differently than it

7   treats other Divers [sic]." *BCID v. Uber, SDNY,* Case No. 1:17-cv-06399-NRB, Dkt 35 (Defts'

8   Mot. to Dismiss, December 8, 2017 at 7). Just as it has intentionally flouted regulation and law

9   enforcement in other contexts[7], Uber has intentionally avoided complying with anti-

10  discrimination laws by failing to make full and equal access to Uber's transportation service a

11  reality through UberWAV.

12      **B.    Uber's Discrimination Results In Real Harm**

13      35.     Uber's failure to make accessible vehicles reliably available through its service

14  denies people who use wheelchairs access to on-demand transportation that could drastically

15  improve their lives, enabling them to travel to a wider variety of destinations without having to

16  rely on transportation via expensive taxis, unreliable paratransit, and limited public transit. It

17  would enable them to travel spontaneously, without having to schedule transportation hours or

18  even days in advance. Unfortunately, Plaintiffs and members of the class are excluded from these

19  benefits, and suffer real harm as a result.

20      36.     People who use wheelchairs face the denigrating experience of being denied a

21  basic service that is available to all other paying customers.  Even when an UberWAV vehicle is

22  technically available, because so few exist, there are typically frequent and lengthy delays.

23

24  _____

    [7] See, e.g., N.Y. Times, How Uber Deceives the Authorities Worldwide,
25  https://www.nytimes.com/2017/03/03/technology/uber-greyball-program-evade-authorities.html,
    March 3, 2017; The Recorder, Former Uber CLO Salle Yoo Named in Reports of Tool Meant to
26  Evade Foreign Authorities,
    https://www.law.com/therecorder/sites/therecorder/2018/01/12/former-uber-clo-salle-yoo-
27  named-in-reports-of-tool-meant-to-evade-foreign-authorities/, January 12, 2018; Eric
    Newcomber, Uber Pushed the Limits of the Law. Now Comes the Reckoning, Bloomberg.com,
28  https://www.bloomberg.com/news/features/2017-10-11/uber-pushed-the-limits-of-the-law-now-
    comes-the-reckoning, October 11, 2017.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  People who use wheelchairs and use UberWAV must contend with missed appointments, being

2  late for events, and the risk of being stranded far from other transportation options because they

3  are unable to secure an UberWAV for their return journeys.

4          37.     Due to distances between destinations in the Bay Area and the severe limitations

5  of public transportation and paratransit, many people with disabilities must use private

6  transportation services to travel from one place to another. The private options are severely

7  lacking as well. Wheelchair accessible taxis are rare or nonexistent. Paratransit is extremely

8  unreliable and often requires lengthy waits.

9          38.     As described below, the lack of effective access to this new mode of

10  transportation means that Plaintiffs may lose employment opportunities or jobs to those with

11  access to more reliable transportation, and may experience social isolation and other harms—not

12  least the stigma associated with not being part of what Uber calls the mainstream "way the world

13  moves."

14      **C.    <u>Judith Smith</u>**

15          39.     Plaintiff Judith Smith lives and works in Oakland, California. She uses a

16  motorized wheelchair because of mobility disabilities.

17          40.     Ms. Smith would and could use Uber if she knew she could count on it for

18  service. She has a smartphone, but she has not downloaded Uber's app. Early in Uber's existence

19  she was excited by the prospect of finding transportation more easily but she quickly learned

20  from friends and colleagues about the lack of accessible vehicles on Uber. Since then, she has

21  watched numerous people attempt to call a wheelchair accessible Uber, and none has ever

22  succeeded. As a result of such incidents, she has concluded it would be futile to download the

23  app.

24          41.     Ms. Smith is the Founder and Artistic Director Emerita of Axis Dance Company,

25  a group of contemporary dancers with and without physical disabilities. Several members of the

26  company, including Marc Brew, the group's Artistic Director, use power wheelchairs. Ms. Smith

27  and her colleagues frequently share their frustrations about their transportation options, and

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  specifically about their inability to access the convenience of Uber. For example, Mr. Brew

2  shared the following frustrating experience from his visit to the Bay Area in 2017.

3      42.    Mr. Brew attended a dance performance at Berkeley's Zellerbach Hall. After the

4  performance, Mr. Brew needed to get home, but it was after midnight and he had missed the last

5  BART train. There were no accessible vehicles on Uber, and all of his friends who had vehicles

6  with wheelchair lifts were either out of town or asleep. Stranded, and with his chair nearly out of

7  power, he ultimately decided to roll to the home of a friend, who was kind enough to put him up

8  for the night.

9      43.    There are many situations in which Ms. Smith would use Uber if WAVs were

10  available. For example, one evening in 2017, Ms. Smith was in San Francisco's Mission District

11  and wanted to go home to Oakland. The battery on her power wheelchair was running low, and if

12  she could have called an Uber to pick her up, she could have made it home without the stress of

13  running out of power. Instead, she rolled to the 16th Street and Mission BART station, but the

14  elevator there was broken. As she rolled to the 24th Street station, the battery on her chair reached

15  critical levels. She managed to get to her train, but by the time she arrived in Oakland, her

16  battery was so depleted that she could not independently roll up the ramp of her home and had to

17  ask a neighbor to assist her.

18      44.    If they were accessible to her, Ms. Smith would call Ubers in exactly the same

19  way as would someone who does not use a wheelchair accessible vehicle. She would order Ubers

20  to and from the airport, when she is out late at night, when she wants to travel to high-density

21  places like San Francisco where parking is limited, or to places that are far from public

22  transportation, in inclement weather, or when health reasons prevent her from driving.

23      45.    In these situations, Ms. Smith is left without any alternative transportation and

24  therefore must stay at home or suffer arduous transportation delays and other indignities from not

25  having access to the same service as Uber users who do not use accessible vehicles.

26      **D.**    **Julie Fuller**

27      46.    Plaintiff Julie Fuller lives in Oakland, California. She has mobility and vision

28  disabilities and uses a motorized wheelchair. She has a smartphone but has not downloaded the

1  Uber app because she has heard from other wheelchair users that there are no wheelchair

2  accessible Ubers. For example, she has discussed this issue at a weekly support group she

3  attends. The other members of her support group, most of whom use motorized wheelchairs,

4  have shared their frustrations with being unable to access Ubers. She has also volunteered at

5  ILRC, attended programming at ILRC, and has discussed the unavailability of wheelchair

6  accessible Ubers with Jessie Lorenz, ILRC's former executive director.

7      47.    Every Wednesday, Ms. Fuller attends weekly support group sessions in North

8  Berkeley. The drive from her house in Oakland to the support group is approximately 15

9  minutes. However, in order to get to the sessions, Ms. Fuller leaves an hour early to catch a ride

10  on BART or AC Transit. She leaves the group early so that she does not have to travel home

11  while it is dark, as she has impaired vision and feels unsafe when she is on the street in her chair

12  at night.

13      48.    Because she feels vulnerable when she is out at night, Ms. Fuller also misses other

14  evening events, such as social gatherings, as well as her neighborhood council, which meets one

15  evening a month at the library a few blocks away from her house. Similarly, when it rains, she

16  stays at home because she does not want to risk waiting outside in the rain for prolonged periods

17  to avoid damage to her chair. If she were able to rely on door-to-door transportation from Uber,

18  she would be able to attend these events.

19      49.    Ms. Fuller is planning to visit her brother, sister-in-law and new baby nephew in

20  Ohio in November 2018. If she knew that UberWAVs were reliably available, she would plan to

21  take one to the airport, but she has decided not to use Uber because she is concerned that a

22  vehicle will not be available to take her, or that delays could cause her to miss her flight.

23      **E.    Sascha Bittner**

24      50.    Sascha Bittner lives in San Francisco, California. She uses a motorized

25  wheelchair because she has mobility disabilities. Ms. Bittner does not have a smartphone but has

26  witnessed family and friends attempt to order a wheelchair accessible vehicle through the app

27  only to find that no vehicles are available. Ms. Bittner has attended programming at ILRC.

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

51.     For example, in January 2017, Ms. Bittner participated in the Women's March with her family in San Francisco. Her family would have used a wheelchair accessible Uber to get to the march, but none was available. Instead, the family engaged in a time consuming ballet of pickups and drop offs to avoid the crowds and limited parking.

52.     Ms. Bittner campaigns for fair wages for in-home care workers and attends events around the Bay Area and the state related to this work. She also participates in workshops at ILRC. She often relies on her stepfather, Bruce Joseph, to drive her in the family's accessible van. However just as often, going out to routine events such as regular medical appointments or meetings becomes an all-day ordeal, when she builds in time for delays and disruptions on public transit. Paratransit is routinely hours behind schedule. For example, she was hours late to a 9:30 appointment for which she scheduled paratransit pickup two hours early.  She is often left out of spontaneous social gatherings because she can't simply call an Uber like everyone else to get there and come pick her up when it is over.

53.     The lack of reliably available wheelchair accessible Ubers excludes Ms. Bittner from an on-demand door-to-door service that is available to people who do not use wheelchairs, and which would greatly improve Ms. Bittner's ability to live an active life. Ms. Bittner would use Uber if she could count on its services being accessible to her.

**F.     Independent Living Resource Center San Francisco**

54.     Independent Living Resource Center San Francisco ("ILRC") is a disability rights organization in San Francisco, California, that advocates for people with disabilities and supports them in living independent and active lives. ILRC's board, staff, and the consumers of its services include people with mobility disabilities who have been deterred from downloading and using Uber because of Uber's failure to make accessible service reliably available to them. Uber's discriminatory policies and practices regularly impose economic harms on ILRC, frustrate its efforts to engage in its core advocacy work, and force it to divert resources that it needs to spend on other work. Additionally, many members of its board, staff and constituency are harmed by Uber's discriminatory failure to make its service equally accessible to people who need WAVs.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1        55.    In recent decades, ILRC has worked to ensure that transportation options are

2 available to people with disabilities. The continued inaccessibility of Uber transportation is thus

3 an issue of concern for ILRC. ILRC has expended time and resources on advocacy work to

4 improve access, including expanding transportation options, for disabled residents of San

5 Francisco. This work has included advocacy and engagement with a wide variety of entities

6 including the San Francisco Metropolitan Transportation Agency, the Mayor's Office on

7 Disability, and San Francisco Paratransit. For example, ILRC has worked with BART to ensure

8 that all aspects of the system, from paying the fare to riding the train, are accessible to people

9 with disabilities, and has advocated for BART to incorporate accessible design principles in its

10 selection of its new train cars.

11        56.    On the issue of ride-sharing services specifically, ILRC has been monitoring the

12 growth of these services, and engaging in advocacy work to encourage ride-sharing services to

13 provide wheelchair accessible vehicles. ILRC has devoted staff time and resources to conducting

14 a survey to collect information about the experiences of people with disabilities using rideshare

15 services, to aid them in their advocacy efforts. It has participated in public engagement processes

16 by the San Francisco Mayor's Office on Disability and the Metropolitan Transportation Agency

17 regarding the availability of on-demand transportation to people with disabilities in San

18 Francisco. This includes efforts to increase the availability of accessible transportation provided

19 by rideshare companies such as Uber.

20        57.    ILRC itself has been injured as a direct result of Uber's failure to provide a

21 service that is accessible to people who use wheelchair accessible vehicles. ILRC's interests are

22 adversely affected because it must expend resources, as it has done in its organizing and

23 advocacy efforts, advocating for its constituents who are harmed by Uber's policies and

24 practices. ILRC has suffered injury in the form of diversion of these resources and frustration of

25 its mission.

26        58.    Some of ILRC's staff and board have mobility disabilities, use power

27 wheelchairs, and therefore use a wheelchair accessible vehicle if they are traveling in a car. For

28 example, ILRC Community Organizer Fiona Hinze uses a motorized wheelchair. Uber would

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

provide her an additional option to commute to work or to off-site meetings, speaking engagements, and other important work-related events. Without the option of a reliable, convenient on-demand mode of transportation, she is often late, gets stuck in inclement weather, or is vulnerable to outages on public transportation. Each such instance imposes a direct economic harm on ILRC, in the form of lost employee work-time and productivity.

59.    Additionally, one or more members of ILRC or consumers of ILRC's services, including Sascha Bittner, have been injured as a direct result of Uber's discriminatory policies and practices and would have standing to sue in their own right. ILRC can bring this action on behalf of its members because the interests at stake are germane to the organization's purpose and only injunctive and declaratory relief are requested, which do not require the participation of individual members in the lawsuit.

### G.    Uber Controls the Transportation Service it has Created

60.    Uber has created a revolutionary new mode of on-demand transportation that has changed the way millions of Americans get around – so much so that the word "Uber" has become synonymous with convenient, reliable, timely, on-demand transportation. Sometimes Uber distances itself from the fundamental role it has played in creating this system by describing itself as merely a broker or middleman, facilitating connections between drivers and riders which might happen anyway. Nothing could be further from the truth. Uber has created and controls its transportation system in every material respect.

### H.    Uber Controls The Drivers And Vehicles

61.    Uber has created an on-demand transportation service which enables a rider to order a car from anywhere in most urban areas and reliably be picked up within minutes and taken to a specific destination, without having to exchange cash. Uber has carefully created this service by recruiting and retaining a network of drivers who enter into contracts with Uber agreeing to provide rides to Uber's customers under terms and conditions determined by Uber. Uber has also carefully cultivated a base of customers by offering them reassurances about the safety and reliability of Uber's transportation. For example Uber runs regular background checks

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  on its drivers[8], requires a standard vehicle safety inspection[9], monitors the ratings that its drivers

2  receive[10], and offers drivers incentives to ensure that there are enough vehicles on the road to

3  meet passenger demand.[11]

4      62.    Individuals who wish to drive for Uber must undergo a driving record check,

5  background check, present their driver's license, vehicle registration, and driver's insurance.

6  Uber sets standards for which makes, models, and age of vehicle can be driven in the Uber

7  network.  These standards are detailed – but nowhere do they mention wheelchair accessible

8  vehicles.  Models must be at least 2002 or later, and in many cases Uber requires much more

9  recent models.  *See* Uber, Vehicle Requirements San Francisco Bay Area,

10  *https://www.uber.com/drive/san-francisco/vehicle-requirements*. Uber also sets standards for

11  which makes, models, and age of vehicle can be driven for each class of Uber vehicle, such as

12  UberSUV, UberXL, Uber Select and UberBLACK.

13      63.    Uber also makes vehicles available to drivers through partnerships with

14  dealerships that offer rental and lease-to-own options to assist its drivers in obtaining vehicles

15  with which to provide Uber transportation services.  *See* Uber, Vehicle Requirements, San

16  Francisco Bay Area, https://www.uber.com/drive/san-francisco/vehicle-requirements/ ("And if

17  you don't have a car, we can help you get one.").

18      64.    Uber even exercises control over the engineering and manufacture of vehicles for

19  its service.  Uber touts its "Advanced Technology Group," a team that includes hardware and

20  product design engineers.  Its goals include "transforming the way the world moves" and

21  "developing long-term technologies that advance Uber's mission of bringing safe, reliable

22  transportation to everyone, everywhere." This work includes self-driving cars and trucks, but not

23

24

25  [8] CNN.com, "Uber tightens driver background checks,"

26  https://money.cnn.com/2018/04/12/technology/uber-safety-update/index.html?iid=EL, April 12, 2018.

27  [9] Uber.com, *Vehicle Inspections,* https://www.uber.com/drive/san-francisco/inspections/

28  [10] Uber.com, *Star Ratings*, https://www.uber.com/drive/resources/how-ratings-work/

[11] Uber Help, *What is surge?*, https://help.uber.com/h/e9375d5e-917b-4bc5-8142-23b89a440eec.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1    wheelchair-accessible vehicles. *See* Uber, *Advanced Technologies Group*,

2    https://www.uber.com/info/atg/.

3         65.    Through its driver contract, Uber dictates whether, when, where, and how

4    frequently drivers choose to offer rides in Uber vehicles. Uber exercises exclusive control over

5    termination of Uber drivers, and routinely terminates drivers for several reasons, including for

6    poor ratings from customers or discriminatorily refusing to provide service to customers.

7         66.    Uber controls which trip requests it transmits to each of its drivers.

8         67.    Uber requires that its drivers meet or exceed the estimated time-of-arrival that

9    Uber generates and provides to each customer.

10        68.    Uber limits drivers to shifts of no more than 12 hours, preventing drivers who

11   have driven for long stints from using the app for six hours to prevent dangerous driver fatigue.[12]

12        69.    Uber requires that Uber drivers refrain from smoking while providing Uber

13   services.

14        70.    Uber prohibits its drivers from discriminating against people based on race,

15   religion, national origin, disability, sexual orientation, sex, marital status, gender identity, age or

16   any other characteristic protected under applicable federal or state law.

17        71.    In addition, Uber instructs Uber drivers that the share of trip requests that they

18   accept through Uber's app should be consistently high, and that Uber drivers may not accept

19   street hails from potential passengers.

20        72.    Uber controls the safety and quality of the service the drivers provide by closely

21   monitoring its drivers. It issues training and directives concerning other requirements to Uber

22   drivers.

23        73.    Uber records many details about the demand-responsive transportation services

24   that its drivers provide, including for each trip: (1) the pickup location, (2) the time of pickup, (3)

25   the drop off location, (4) the time of drop off, (5) the distance traveled, (6) the trip route, (7) the

26

27

28   [12] Uber.com, "Another Step to Prevent Drowsy Driving,"
     https://www.uber.com/newsroom/drowsydriving/, February 12, 2018.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

1  trip duration, and (8) the customer's identity.  Uber employees who supervise drivers have easy

2  access to this data.

3          74.    Uber monitors its Uber drivers' performance by asking customers for written

4  feedback, including a driver "rating" of between 1 and 5, via the app, after every ride that a

5  driver provides, and Uber routinely follows up with customers who express dissatisfaction. Uber

6  regularly terminates or suspends Uber drivers whose average customer rating falls below a

7  certain threshold.

8          75.    In addition, Uber maintains general commercial liability insurance to cover claims

9  concerning incidents that occur while drivers are providing Uber transportation services.

10         76.    Uber tightly controls payment for its Uber transportation services.

11         77.    Uber controls the fare charged for each trip through an algorithm which takes

12  account of the distance traveled and duration of the trip, along with the intensity of demand for

13  rides at the time of the ride request.

14         78.    Uber controls the supply of drivers by encouraging them to work at particular

15  times (by increasing fares when there is increased demand), by offering them financial rewards

16  for accumulating a large number of trips, and by providing them with information about where

17  they are likely to get more trips or preferential fares. Uber exerts control over how many vehicles

18  provide its service at a given time through carefully calibrated adjustments in its service's

19  financial incentives.  For example, Uber's "surge" pricing imposes additional charges during

20  high-demand times to "make sure those who need a ride can get one."  *See* Uber Help, *What is*

21  *surge?*, https://help.uber.com/h/e9375d5e-917b-4bc5-8142-23b89a440eec.

22     **I.    Uber Controls Who Can Ride In An Uber and How**

23         79.    In addition to carefully controlling the drivers, Uber also controls who may use

24  Uber's transportation service.  In order to use Uber, customers must download Uber's app and

25  create an account, which requires them to agree to Uber's terms of service. The customer can

26  then order a ride for themselves or someone else. The entire ride is mediated by Uber from start

27  to finish. A rider could request an Uber, travel to their destination, and pay for it, all without ever

28  speaking to the driver.

---

*ILRC, et al. v. Uber Technologies, Inc., et al*
**Complaint**                                                                      18

1    80.    To call an Uber, the customer opens the Uber app, selects which class of vehicle

2    they want and then submits a request to Uber for a vehicle through the app, either for their own

3    use or for other passengers.

4    81.    Uber then identifies a close, available Uber vehicle and then notifies the requester

5    either by text message or the Uber app that a driver has been assigned.  The notification includes

6    the driver's name, customer rating, phone number, vehicle license plate number, make and

7    model of the vehicle, and the driver's estimated time of arrival.  If the customer submitted a

8    desired trip destination, then Uber will provide a fare estimate. The customer can then track the

9    location of the Uber as the driver navigates to the customer's identified pick-up address.  The

10   driver and customer can communicate with each other through Uber's app.

11   82.    Once the Uber arrives, the Uber app notifies the customer, and they and any other

12   associated passengers may then board the vehicle. The driver then begins the trip in the Uber

13   software app and proceeds to the desired destination.  If the requesting customer submitted the

14   destination address, the app will supply the driver with turn-by-turn directions to the desired

15   destination

16   83.    When the Uber arrives at the desired destination, the driver ends the trip in the

17   Uber's app.  Uber then charges the customer's credit card for the trip fare.  No cash is

18   exchanged.  Uber allows the rider and the driver to provide ratings of each other in the app after

19   the ride has concluded.

20   84.    Fares for Uber's transportation services are based on the duration and distance of

21   each trip and other factors such as demand at the time and place of the ride, as determined by

22   Uber's algorithms.  Uber keeps a percentage of each fare.

23   85.    Uber compensates its Uber drivers based on the duration and distance of the trips

24   that they provide to customers.  Payments are not transferred directly from customers to drivers;

25   rather, Uber collects and holds customer payments, deducts fees, and then later transfers money

26   to drivers.  Customers who dispute the fare for a particular trip must contact Uber customer

27   service representatives to request an adjustment to their fares.

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

86.   Uber closely monitors and controls interactions between Uber drivers and customers.

87.   In the San Francisco Bay Area, Uber purports to offer the full range of classes of Uber transportation service to the public. Customers can order an Uber at any time of day and in any part of the Bay Area, selecting from a wide range of options including luxury vehicles, standard vehicles, large vehicles, or carpools, which enable them to ride with strangers for a reduced fare. Although Uber advertises UberWAV in the Bay Area, Defendants have chosen not to make wheelchair accessible Ubers available in the same reliable and timely manner as their services for riders who do not need wheelchair accessible Ubers.

**J.   Uber Discriminates Against People Who Need Wheelchair Accessible Ubers.**

88.   Uber provides a valuable transportation alternative to millions of Bay Area residents, allowing people to more easily travel to work, social events, community engagements, appointments, and other destinations, yet Uber excludes people with mobility disabilities from these same benefits of its convenient transportation.

89.   Uber could end its discrimination against people who use wheelchair accessible vehicles if it chose to do so. In fact it has already begun providing wheelchair accessible Ubers in several major cities. For example, in London, Uber began providing wheelchair accessible Ubers in 2016 through a service called UberACCESS.[13] It rolled out this service to six more U.K. cities the following year.[14]

90.   Closer to home, Uber has made UberWAVs available in Philadelphia, rolling out a fleet of wheelchair accessible vehicles in June of 2017.[15]

---

[13] Uber.com, "Introducing uberWAV: transportation for everyone, everywhere in London," https://newsroom.uber.com/uk/ldnwav/, May 10, 2016.

[14] Uber.com, "Forward-facing, forward thinking: introducing uberACCESS," https://www.uber.com/en-GB/blog/uber-access-2/, March 23, 2017;TheNextWeb.com, "Uber's wheelchair-accessible uberACCESS service launches in four new UK markets," https://thenextweb.com/insider/2017/07/14/ubers-wheelchair-accessible-uberaccess-service-launches-four-new-uk-markets/, July 14, 2017.

[15] Philly.com, "Uber and Lyft's wheelchair access grows, with room to improve," http://www.philly.com/philly/business/transportation/ubers-wheelchair-accessibility-grows-with-room-for-improvement-20170706.html, July 6, 2017.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

91.     However, Uber has not provided wheelchair accessible Ubers in a way which would make Uber's transportation service fully and equally accessible in the Bay Area.

92.     Plaintiffs do not here specifically seek an order requiring Uber to purchase vehicles as a way of putting an end to its discriminatory conduct. Given Uber's extensive control over the operation of the drivers, including through its fare structure, there are many ways Uber can provide relief.

93.     In previous communications with Uber, Plaintiffs and their counsel have enumerated some of the possible ways that appropriate WAV service could be achieved, and have made numerous requests to Uber to modify its policies to provide full and equal access to its service for riders who need WAVs. Plaintiffs previously sought remedies for Uber's failure to provide equal access to its service based on California anti-discrimination laws in California state court. In September 2018, the case was precluded from being heard on the merits by state law jurisdictional issues.

94.     Before the state court litigation began, counsel for Plaintiffs raised concerns about the accessibility of Uber's service. Several months later, Plaintiffs' counsel sent Uber's counsel a letter noting the lack of progress on this issue and Plaintiffs initiated the state court action soon thereafter. Throughout the state court litigation, Plaintiffs made overtures to Uber regarding possible modifications to its policies and practices that could result in equivalent service. On September 26, 2018, Plaintiffs' counsel and Fiona Hinze, of Plaintiff ILRC, met with Uber to discuss specific policy modifications Uber could make in order to provide equal access to its service to people who need WAVs. Plaintiffs' counsel followed up on October 10, 2018 with a list of specific modifications.

95.     Despite Plaintiffs' requests over the past year, Uber has not responded with modifications sufficient to provide full and equal access to its transportation services.

### FIRST CAUSE OF ACTION

Discrimination Prohibited by the Americans With Disabilities Act
(42 U.S.C. §§ 12181, *et seq.*)

96.     Plaintiffs incorporate by reference as though fully set forth herein the preceding and subsequent paragraphs of this Complaint.

97. Title III of the ADA prohibits discrimination on the basis of disability in the full and equal enjoyment of specified public transportation services provided by private entities primarily engaged in the business of transporting people and whose operations affect commerce. 42 U.S.C. § 12184.

98. Plaintiffs and all members of the class are persons with "disabilities" entitled to protection under the ADA.

99. Plaintiffs and members of the putative class, including members of Plaintiff ILRC or participants in ILRC's services such as Plaintiffs Julie Fuller and Sascha Bittner, are aware of Defendants' unlawful actions, and their knowledge of this discrimination has deterred them from using Uber's transportation service. Moreover, Plaintiffs and members of the putative class, including members of Plaintiff ILRC and participants in ILRC's services such as Plaintiff Sascha Bittner, have been and continue to be denied access to Uber's transportation service on occasions when a friend or colleague has attempted to order an Uber ride for them and found there are no wheelchair accessible Ubers available.

100. Public transportation is defined to mean "transportation by bus, rail, or any other conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis." 42 U.S.C. § 12181(10).

101. Defendants provide specified public transportation services within the meaning of the term under Title III on a regular and continuing basis.

102. Title III of the ADA also prohibits discrimination on the basis of disability in the full and equal enjoyment of services provided by places of public accommodations. 42 U.S.C. § 12182.

103. Defendants operate a public accommodation subject to Title III's nondiscrimination requirements. 42 U.S.C. §§ 12181, 12182.

104. Defendants operate a "travel service" as defined by 42 U.S.C. § 12181.

105. Defendants' operations affect interstate commerce, including by providing transportation across state lines.

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644

106.     Defendants discriminate against Plaintiffs and members of the putative class by denying them full and equal enjoyment of Uber's goods, services, facilities, privileges, advantages, and/or accommodations in violation of Title III of the ADA. Defendants have failed to make reasonable modifications to their policies, practices, or procedures, provide auxiliary aids and services, and remove barriers in order to afford full and equal access to their service to Plaintiffs and members of the putative class.

107.     Therefore, Plaintiffs are entitled to injunctive relief remedying the discrimination under 42 U.S.C. § 12188. Unless the Court issues injunctive relief to halt Uber's unlawful practices, Plaintiffs will continue to suffer irreparable harm.

108.     Plaintiffs are also entitled to reasonable attorneys' fees, costs, and expenses.

109.     WHEREFORE, Plaintiffs pray for relief as set forth below.

## SECOND CAUSE OF ACTION

### Declaratory Relief on Behalf of Plaintiffs

110.     Plaintiffs incorporate by reference all foregoing and subsequent allegations as though fully set forth herein.

111.     An actual controversy exists between the parties. Plaintiffs contend, and are informed and believe that Defendants deny, that by failing to adopt policies and practices that make WAVs available through its service, Defendants are failing to comply with applicable laws, including but not limited to Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181, *et seq.*

112.     A judicial declaration is necessary and appropriate at this time in order that the parties may know their respective rights and duties and act accordingly.

WHEREFORE, Plaintiffs pray for the relief set forth below.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs respectfully pray for relief as follows:

1.     For an order certifying this case as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2), and appointing Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

---

*ILRC, et al. v. Uber Technologies, Inc., et al*
**Complaint**

1      2.      For an order finding and declaring that the acts and practices of Uber as set forth

2 herein are unlawful, unfair, and violate the Americans with Disabilities Act, 42 U.S.C. §§ 12181,

3 *et seq.*;

4      3.      For a permanent injunction pursuant to the Americans with Disabilities Act, 42

5 U.S.C. §§ 12181, *et seq.*, to ensure that individuals who use wheelchairs, including Plaintiffs, are

6 able to use Uber's service on a basis that is full and equal to that which is available to other

7 members of the general public;

8      4.      For an award of attorneys' fees, costs and expenses incurred in the filing and

9 prosecution of this action, as authorized by 42 U.S.C. §12188; and

10      5.      For such other and further relief as the Court deems just and proper.

11

12 DATED:  October 24, 2018                    Respectfully submitted,

13

14                                             DISABILITY RIGHTS ADVOCATES

15

16                                             _____
                                               Sidney Wolinsky
17                                             Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

DISABILITY RIGHTS ADVOCATES
2001 CENTER STREET, FOURTH FLOOR
BERKELEY, CALIFORNIA 94704-1204
(510) 665-8644